**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL SHAPIRO, et al., | : | CIVIL ACTION NO. 07-3153 (MLC) |
|  | : |  |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| BAKER & TAYLOR, INC., et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

Plaintiffs Michael Shapiro ("Shapiro") and Tanya Shapiro commenced this action against defendants, Baker & Taylor, Inc. ("Baker"), Castle Harlan Partners IV, L.P., Richard Willis, George Coe, and Michael Utasi, alleging, inter alia, (1) violations of the (a) Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and (b) New Jersey Family Leave Act ("FLA"), N.J.S.A. § 34:11B-1, et seq., (2) breach of contract, (3) negligent hiring and retention, (4) negligent infliction of emotional distress, (5) intentional infliction of emotional distress, (6) defamation, and (7) "violation of public policy." (See dkt. entry no. 1, Compl.)  Defendants now move, in effect, to compel arbitration.  (Dkt. entry no. 22.)  Plaintiffs oppose the motion, arguing, inter alia, that enforcement of the arbitration provision would be unconscionable.  (Dkt. entry no. 24.)  The Court will decide the motion without oral argument and on the papers pursuant to Federal Rule of Civil Procedure 78(b).

The Court, for the reasons stated herein, will (1) grant the motion, in effect, to compel arbitration, and (2) dismiss the Complaint without prejudice.

### BACKGROUND

Baker, on November 15, 2004, acquired Libros Sin Fronteras Co. ("LSF"), a Spanish language book distribution company wholly owned and operated by Shapiro. (Compl. at 6.) In connection with the acquisition, the parties negotiated and executed, with the assistance of counsel, an Asset Purchase Agreement ("APA"). The APA provides that, along with certain payments to be made by Baker to LSF and Shapiro for the sale of the company's assets and inventory, Shapiro was to be given employment at Baker and the potential opportunity to receive up to $300,000 in earn-out bonuses. (Dkt. entry no. 22, Rattay Certif., Ex. B at 3-4; dkt. entry no. 22, Coe Aff. at 2.) A three-year Employment Agreement between Baker and Shapiro, also dated November 15, 2004, set forth Shapiro's terms of employment. (See Rattay Certif., Ex. C.) The Employment Agreement, referenced at various points in the APA, was attached to the APA as "Exhibit A," which stated: "See the Employment Agreement attached hereto and incorporated herein by reference." (Id., Ex. B at 24; see id. at 4, 10, 11.)

Among the various contract provisions, the APA includes an arbitration provision, negotiated by the parties with the assistance of counsel, stating:

2

Arbitration. Any controversy, dispute or claim for money
damages arising out of or relating in any way to this
Agreement or the other Transaction Documents to which the
Parties are a party that cannot be resolved by negotiation
among the parties within 30 days after such dispute first
arises shall be settled exclusively by arbitration in the
City of Bridgewater, New Jersey.

(Id. at 15; see Coe Aff. at 2 & Ex. A.)[1]  The provision mandates

that the arbitration shall be governed by the Federal Arbitration

Act ("FAA"), 9 U.S.C. § 1, et seq.  (Rattay Certif., Ex. B at

15.)

The arbitration provision also allocates the costs of

arbitration, providing:

The fees and expenses of the Institute and the arbitrator
shall be shared equally by the parties and advanced by them
from time to time as required; provided that at the
conclusion of the arbitration, if the claim or either party
is upheld by the arbitrator in all material respects, the
arbitrator shall award costs and expenses (including the
costs of the arbitration previously advanced and the fees
and expenses of attorneys, accountants and other experts)
and interest at 8% per annum (compounded semi-annually,
based upon a 360-day year) to the prevailing party.

---

[1]    The provision further sets forth that any arbitration "shall
be administered by the Center for Public Resources Institute for
Dispute Resolutions (the "Institute") in accordance with its then
prevailing Rules for Non-Administered Arbitration of Business
Disputes (except as otherwise provided herein), by one (1)
independent and impartial arbitrator, who shall be appointed by
mutual agreement of Seller and Buyer."  (Rattay Certif., Ex. B at
15.)

3

(Id.)[2]

 The APA, in addition, includes a choice of law provision, stating the agreement shall be governed and construed in accordance with Delaware law.  (Id. at 14.)  It also contains a merger clause, stating: "This Agreement (including the documents referred to herein) constitutes the entire agreement between the

---

[2] The remainder of the arbitration provision provides:

 The arbitrator shall permit and facilitate such discovery as they shall determine appropriate in the circumstances, taking into account the needs of the parties and the desirability of making discovery expeditious and cost effective.  Buyer and Seller shall keep confidential, and shall not use for any purposes other than in connection with the arbitration, any proprietary information, trade secrets or other non-public information disclosed in discovery.  The arbitrator shall render his award within 90 days of the conclusion of the arbitration hearing.  The award of the arbitrator shall be accompanied by findings of fact and a written statement of reasons for the decision. The arbitrator shall make his award in strict conformity with this Agreement and shall have no power to depart from or change any of the provisions hereof. Except as otherwise expressly provided in this Agreement, the arbitrator shall be expressly empowered to determine and award any and all types of Losses in connection with any dispute arising out of or relating in any way to this Agreement or the other Transaction Documents, and each party hereby irrevocably waives any objection to the recovery by the other party hereto of such damages.  The parties agree to be bound by any award rendered in such arbitration proceeding.  Any judgment thereon may be enforced in any court having jurisdiction.  Nothing contained in this Section shall prohibit either party from seeking equitable relief without first resorting to arbitration under such circumstances as that party's interests hereunder and in its property will be otherwise compromised.

(Rattay Certif., Ex. B at 15.)

Parties regarding the subject matter hereof and supersedes any prior understanding, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof." (Id. at 13.)

The Employment Agreement, simultaneously entered into by Baker and Shapiro, provides that Shapiro was to be employed by Baker from November 15, 2004, through December 31, 2007. (Rattay Certif., Ex. C at 1, 8.)[3]  Shapiro was to be paid an annual compensation of $110,000 and various other benefits, including a $10,000 bonus to relocate from Washington to New Jersey, and annual $100,000 performance earn-out bonuses if certain goals were met. (Id. at 1-2.)  The Employment Agreement, which does not contain an arbitration clause, states:

> Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction . . . for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(Id. at 14.)

---

[3]    The Employment Agreement does, however, note that the employment term would be "[s]ubject to earlier termination of Executive's employment" and "employment may be terminated at any time for any reason." (Rattay Certif., Ex. C at 8.)

Shapiro commenced employment according to the terms of the agreements in November 2004 and, in 2005, was paid the annual salary, as well as a $100,000 performance-based earn-out bonus. (Compl. at 7.)  Shapiro was given a raise to $115,000 in 2006, but was not paid the earn-out bonus, although he alleges he "met, and exceeded, Baker's legitimate employment expectations."  (Id.; dkt. entry no. 22, Def. Br. at 6.)

Pursuant to Baker's FMLA policy, upon the birth of his daughter in October 2006, Shapiro was given 12 weeks of unpaid FMLA leave and worked remotely from his home in Seattle, Washington.  (Compl. at 1-2; see dkt. entry no. 24, Richter Certif., Ex. H; Rattay Certif., Ex. D.)  Plaintiff returned to work in New Jersey on March 27, 2007.  (Compl. at 2.)

Shapiro's employment with Baker, however, was terminated for cause on April 20, 2007.  (See Rattay Certif., Ex. D.)  The stated basis for termination was that he "intentionally and repeatedly misrepresented [his] work hours for payroll purposes in order to receive salary payments to which [he was] not entitled."  (Id. at 1.)  Baker noted that it appeared as if Shapiro had deceived the company by (1) "quietly purchas[ing] a home in Seattle as early as July 2006," (2) failing to honor "the commitment [he] made to relocate to and work in Bridgewater, New Jersey," and (3) misusing "the Company's FMLA policy to enable

6

[him] to hasten [his] return to Seattle without informing the Company of [his] true intentions." (Id.)

Shapiro filed the Complaint in this matter on July 9, 2007, while unemployed. (See Compl.)  Defendants, in August 2007, moved, inter alia, to compel arbitration pursuant to the APA arbitration provision. (Dkt. entry no. 4).  The Court denied the motion without prejudice on January 30, 2008, determining, inter alia, that the parties were entitled to limited discovery regarding the projected fees and expenses of the Institute and the arbitrator.  (Dkt. entry no. 12, 1-30-08 Order.)  Defendants now move again, in effect, to compel arbitration.  (Dkt. entry no. 22.)

The parties have conducted extensive discovery on plaintiffs' financial status, as well as the potential costs of arbitration.  During his unemployment, Shapiro received $13,936 in unemployment benefits from the State of New Jersey.  (Dkt. entry no. 22, Def. Stmt. of Facts at 6.)  Shapiro also received $950 in rental income from a home owned in Olympia, Washington. (Rattay Certif., Ex. H, Shapiro Dep. at 20-21.)  At the time of Shapiro's termination, Mrs. Shapiro was a graduate school student and worked as an unpaid intern.  (Dkt. entry no. 24, Shapiro Certif. at 3.)

Shapiro was unemployed from April 20, 2007, until January 2, 2008, when he commenced employment as the Webjunction Partner

Development Manager for Online Computer Library Center, Inc. ("OCLC").  (See Rattay Certif., Ex. J.)  The terms of his employment, in addition to the $5,000 signing bonus he received, include a $95,000 annual salary, as well as health, dental, and vision care benefits, a flexible spending account to defer health insurance and child care costs, and life insurance.  (See id., Ex. J; see also id., Ex. G (providing list of monthly co-payments made by Shapiro)).  Shapiro's gross monthly pay amounts to $7,943.59, of which he nets $4,764.44.  (Id., Ex. K.)  Shapiro directs 17 percent of his pay check, approximately $1,345.83 per month, into his 401(k) account.  (Id., Ex. H, Shapiro Dep. at 46-47.)

Mrs. Shapiro is employed as a therapist at a nonprofit organization, and works approximately 20 to 24 hours per week at the current rate of $17.06 per hour.  (Id., Ex. H, Shapiro Dep. at 48-50.)

Plaintiffs have various real estate holdings.  Shapiro purchased his family's unmortgaged Seattle home for $880,000 in 2006.  (Id., Ex. F; id., Ex. H, Shapiro Dep. at 18-19.)  Plaintiffs own a vacation home in Argentina, also with no mortgage, purchased by Shapiro in 2005 for $160,000.  (Id., Ex. F.)  Plaintiffs spend a monthly allotment of $1,000 on maintenance for the Argentinean home and, as of March 2008, plaintiffs had earned $5,300 in rental income from the property.

(Id., Ex. H, Shapiro Dep. at 28-31.)  Plaintiffs also own a
vacant two-acre unmortgaged property in Olympia, Washington,
purchased by Shapiro in 2003 for $80,000.  (Id., Ex. F; id., Ex.
H, Shapiro Dep. at 32.)  Shapiro, in 2008, refused two separate
offers to sell the vacant parcel for $185,000 and $200,000,
respectively.  (See id., Ex. M; id., Ex. N; id., Ex. H, Shapiro
Dep. at 37.)  Plaintiffs, furthermore, in approximately February
2008, sold a home owned in Olympia, to earn a net profit of
$78,000.  (Id., Ex. H, Shapiro Dep. at 21-24.)  Shapiro also owns
a one percent interest in a parcel of land in Panama.  The land
was purchased for $300,000, but Shapiro was given the ownership
interest at no cost.  (Id., Ex. H, Shapiro Dep. at 37-39.)

The balance of the various accounts held by plaintiffs, in
March 2008 during the time of expedited discovery, stood at: (1)
IRA account - $36,493; (2) 401(k) account - $27,778; and (3)
savings account - $51,141.74  (Id., Ex. R.)  Shapiro, in
addition, inherited $461,260.82 from his father's estate between
2006 and 2007.  (Id., Ex. L; id., Ex. H, Shapiro Dep. at 63-67.)
He also stands to inherit, once the estate is fully settled, a
one-third interest of $50,251.94.  (Id., Ex. M.)   At the time of
briefing, plaintiffs had no credit card debt.  (Id., Ex. H,
Shapiro Dep. at 26.)

Regarding counsels' fees, as of August 2008, Shapiro had
paid his counsel of record $12,500.  (Richter Certif. at 5;

Rattay Certif., Ex. H, Shapiro Dep. at 75-76.)  He paid $750 to
another attorney in 2008 for work regarding claims against
Baker.[4]

## DISCUSSION

## I.   Motions to Compel Arbitration

Motions to compel arbitration are reviewed, in the first
instance, under the well-settled summary judgment standard set
forth in Federal Rule of Procedure ("Rule") 56(c).  Bellevue Drug
Co. v. Advance PCS, 333 F.Supp.2d 318, 322 (E.D. Pa. 2004); Hall
v. AT&T Mobility LLC, No. 07-5325, 2009 U.S. Dist. LEXIS 25745,
at *8 (D.N.J. Mar. 30, 2009).  Rule 56(c) provides, inter alia,
that summary judgment is proper if the pleadings, the discovery
and disclosure materials, and any affidavits show that there is
no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c).
The summary judgment movant bears the initial burden of showing
that there is no genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met
this prima facie burden, the non-movant must set out specific
facts showing that there is a genuine issue for trial.
Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual evidence

---

[4]   Plaintiffs, in addition, took two family vacations during
Shapiro's unemployment period – a May 2007 vacation to Disneyland
in California for approximately $1,500 and an October 2007
vacation to Madison, Washington for approximately $1,500.  (See
Rattay Certif., Ex. I.)  Plaintiffs also took their family on
vacation to Argentina in March 2008 for an estimated cost of
$7,000.  (See id.).

that raises a genuine issue of material fact and may not rely on mere allegations. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or

11

is not significantly probative, summary judgment may be granted."
Id. at 249-50 (internal citations omitted).

## II.  Legal Standards Governing the Arbitration Provision

The FAA provides:

> [a] written provision in . . . a contract evidencing a
> transaction involving commerce to settle by arbitration a
> controversy thereafter arising out of such contract or
> transaction, . . . shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in
> equity for the revocation of any contract.

9 U.S.C. § 2.  A court thus may direct a dispute to be resolved
through arbitration upon petition by the party aggrieved by the
failure, neglect, or refusal of another to arbitrate.  Id. § 4.

When ruling on a motion to compel arbitration, however, a
court may only determine whether the merits of the case should be
arbitrated or litigated, and may not consider the merits of the
underlying claims.  Great W. Mortgage Corp. v. Peacock, 110 F.3d
222, 228 (3d Cir. 1997).  Before compelling arbitration, a court
must ensure that: (1) the parties entered into a valid
arbitration agreement; and (2) the dispute between the parties
falls within the language of the arbitration agreement.  Trippe
Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

In deciding whether a valid agreement to arbitrate exists,
generally applicable state-law contract defenses, such as fraud,
duress, or unconscionability, may be applied to invalidate
arbitration agreements.  Gay v. CreditInform, 511 F.3d 369, 388
(3d Cir. 2007).  A court may refer to federal substantive law and

12

relevant state contract law to do so.  Id.; see Battaglia v. McKendry, 233 F.3d 720, 724 (3d Cir. 2000).

"There is a strong presumption in favor of arbitration, and doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Gay, 511 F.3d at 387 (internal quotations omitted); see also Brayman Constr. Corp. v. Homes Ins. Co., 319 F.3d 622, 625 (3d Cir. 2003); Battaglia, 233 F.3d at 727 ("[A]n agreement to arbitrate a particular dispute should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotations omitted).[5]

The APA, containing the arbitration provision, mandates that Delaware law governs any contractual disputes.  Delaware courts have recognized that the public policy of Delaware, in line with the FAA, encourages the use of arbitration as an alternative to litigation.  DMS Props.- First v. P.W. Scott Assocs., 748 A.2d 389, 391 (Del. 2000); SBC Interactive v. Corporate Media Partners, 714 A.2d 758, 761 (Del. 1998); see also Del. Code Ann. tit. 10, § 5701 ("A written agreement to submit to arbitration any controversy existing at or arising after the effective date

---

[5]   "Nonetheless, while interpretive disputes should be resolved in favor of arbitrability, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt."  Gay, 511 F.3d at 387 (internal citations omitted).

of the agreement is valid, enforceable and irrevocable.")  Any doubts as to arbitrability are to be resolved in favor of arbitration.  SBC Interactive, 714 A.2d at 761.  A court, however, will not compel arbitration absent a clear expression of such an intent.  Detroit Med. Ctr. v. Provider Healthnet Servs., 269 F.Supp.2d 487, 491 (D. Del. 2003); SBC Interactive, 714 A.2d at 761.

When an arbitration provision contained in a contract is broad, the presumption in favor of arbitrability is particularly applicable.  AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986); Brayman Constr. Corp., 319 F.3d at 625; see also Dean Witter Reynolds v. Byrd, 470 U.S. 213, 219 (1985) (finding "[t]he legislative history of the [FAA] establishes that the purpose behind the passage was to ensure judicial enforcement of privately made agreements to arbitrate"); John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 138 (3d Cir. 1998) (noting that "[a]rbitration is a matter of contract" and courts must respect the parties' bargained-for method of dispute resolution); United Steelworkers of Am. v. Lukens Steel Co., 969 F.2d 1468, 1474 (3d Cir. 1992) (stating "[i]t is not arbitration per se that federal policy favors, but rather final adjustment of differences by a means selected by the parties") (internal citations omitted).

## III. **The Arbitration Agreement is Enforceable**

Plaintiffs contend that the arbitration provision contained in the APA is unconscionable and thus unenforceable because it contains "impermissible" cost-sharing and cost-shifting provisions.[6] (Dkt entry no. 24, Pl. Br. at 17-28.) Specifically, plaintiffs argue that the cost-sharing and cost-shifting provisions are "unconscionable under the acceptable business standards and mores endorsed by the New Jersey Courts." (Id. at 21-28.)

Delaware law recognizes the doctrine of unconscionability. See Tulowitzki v. Atl. Richfield Co., 396 A.2d 959, 960 (Del. 1978) (noting that for a contract to be unconscionable, "there must be an absence of meaningful choice and contract terms unreasonably favorable to one of the parties"). This doctrine encompasses both procedural and substantive elements. See Ryan v. Weiner, 610 A.2d 1377, 1385 (Del. Ch. 1992) (holding that land transaction was both procedurally and substantively unconscionable).

---

[6]     The term "cost-sharing," also referred to as "cost-splitting" or "fee-splitting," describes the arrangement by which the parties to an arbitration agreement bear the costs of an arbitration equally.  To the contrary, a "cost-shifting" or a "loser pays" arbitral provision is the arrangement by which the arbitrator may determine that one of the parties should bear all or most of the costs of the arbitration.  See Morrison v. Circuit City Stores, 317 F.3d 646, 657 n.3 (6th Cir. 2003).

An agreement to arbitrate may be substantively unconscionable, and thus unenforceable, if a prospective litigant would be unable to effectively vindicate a federal statutory cause of action in the arbitral forum.  Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 268-70 (3d Cir. 2003); Blair v. Scott Specialty Gases, 283 F.3d 595, 605 (3d Cir. 2002); see also Gilmer v. Interstate/ Johnson Lane Corp., 500 U.S. 20, 28 (1991) ("So long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.") (internal quotation omitted).  Arbitration costs are directly related to a prospective litigant's ability to pursue a claim.  Blair, 283 F.3d at 605.  Thus, if the existence of substantial arbitration fees, or the splitting or sharing of the arbitration costs under a particular arbitration agreement, effectively prevent the vindication of a plaintiff's statutory rights, the claims cannot be subject to mandatory arbitration under that agreement.  Id.; see Green Tree Fin. Corp.- AL v. Randolph, 531 U.S. 79, 90-91 (2000); Morrison, 317 F.3d at 659.[7]

---

[7]    "A party seeking to avoid arbitration for a statutory claim has the burden of establishing that Congress intended to preclude arbitration of the claim.  Congress's intention may be found in the text, legislative history, or in an inherent conflict between arbitration and the statute's underling purposes.  Throughout such an inquiry, it should be kept in mind that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  Gay, 511 F.3d at 379 (internal citations and quotations omitted).

16

A case-by-case approach is used to determine whether a particular cost-splitting or cost-sharing provision in an arbitration agreement denies potential litigants the opportunity to vindicate their statutory rights.  Green Tree Fin. Corp.-AL, 531 U.S. at 89-92; Alexander, 341 F.3d at 269-70.  A prospective litigant resisting arbitration on this basis has the burden to demonstrate that arbitration would be prohibitively expensive by showing the likelihood of incurring such costs.  Blair, 283 F.3d at 607.  The mere existence of cost-splitting or cost-sharing provisions in an arbitration agreement does not satisfy this burden.  See id. at 610; Alexander, 341 F.3d at 269-70.  A showing that the prospective litigant has a negative net income, and therefore cannot afford to pay any costs of arbitration, no matter how much or how little they prove to be, is likewise inadequate to satisfy this burden.  See Blair, 283 F.3d at 608. The party seeking to compel arbitration must also come forward with contrary evidence to rebut the prospective litigant's claims that the costs of arbitration would be prohibitively expensive. Id. at 607.

In Blair, the Third Circuit stated that a cost-splitting provision, providing that each party pay half of the arbitration expenses, would be unconscionable if it made arbitration prohibitively expensive for the plaintiff, thereby depriving the plaintiff of the ability to vindicate her statutory rights. Id.

17

at 607-08.  The Court held that the plaintiff had not established
her inability to pay the costs of arbitration, but was entitled
to limited discovery on this issue.  Id. at 610.

In Alexander, the Third Circuit found a cost-shifting
provision to be substantively unconscionable where plaintiffs
submitted evidence that they could not meet the financial burden
of the arbitral forum.  341 F.3d at 269-70.  The Court, inter
alia, further found that the provision limiting plaintiffs'
available relief and requiring that the parties bear their own
costs was substantively unconscionable because the restrictions
were "one-sided in the extreme and unreasonably favorable to
[defendant]. . . . An employee therefore [was] not entitled to
complete compensation for any harm done and the company [was]
able to evade full responsibility for its actions."  Id. at 267.

In Parilla v. IAP Worldwide Svs. VI, the Third Circuit found
that a cost-sharing provision, providing "[o]ther than
arbitrator's fees and expenses, each party shall bear its own
costs and expenses, including attorney's fees," to be
substantively unconscionable as to any claim because such
relinquishment helped the defendant-employer, the party with a
substantially stronger bargaining position.  368 F.3d 269, 278-79
(3d Cir. 2004).  It also remanded the case to the district court
for determination of "whether the reasonably anticipatable fees
and expenses of the arbitrator" and plaintiff's financial

18

circumstances were such that the prospect of having to potentially pay, as mandated by a cost-shifting arbitral provision in the contract, "unduly burden[ed] her right to seek relief." Id. at 284.

Upon analyzing the facts presented here, the Court finds that the reasonable fees and expenses of the arbitrator, as well as plaintiffs' financial circumstances, are not such that the prospect of plaintiffs potentially having to pay costs up front or attorney's fees, in the event of losing, unduly burdens their right to seek relief.

The arbitration provision at issue states:

> The fees and expenses of the Institute and the arbitrator shall be shared equally by the parties and advanced by them from time to time as required; provided that at the conclusion of the arbitration, if the claim or either party is upheld by the arbitrator in all material respects, the arbitrator shall award costs and expenses (including the costs of the arbitration previously advanced and the fees and expenses of attorneys, accountants and other experts) and interest at 8% per annum (compounded semi-annually, based upon a 360-day year) to the prevailing party.

(Rattay Certif., Ex. B at 15.)  Accordingly, the agreement contains both a cost-sharing provision and a potential cost-shifting provision.

The extensive discovery conducted by the parties into plaintiffs' financial status, including plaintiffs' substantial assets, has revealed that Shapiro's monthly income now appears to exceed his expenses.  (See dkt. entry no. 24, Shapiro Aff. at 8;

Shapiro Certif., Ex. A.)  He is now employed earning an annual salary of $95,000, including full medical, dental, and vision benefits, and earned a $5,000 signing bonus in January 2008 upon commencement of employment.  Shapiro earned approximately $610,000 from Baker between 2004-2007 through the sale of LSF and the employment opportunities he was given.  He inherited over $400,000 in 2006-2007.  The family lives in a house purchased mortgage-free for $880,000, owns another mortgage-free home in Argentina, made a net profit of $78,000 in January 2008 on the sale of another home, and, among other real estate interests, owns a vacant lot for which offers of $185,000 and $200,000 were made by prospective purchasers.  Plaintiffs' family, moreover, has participated in several domestic and international vacations during the past few years.

Both parties have submitted affidavits or certifications regarding the potential cost of arbitration.  Plaintiffs have submitted the fees of two retired judges providing private dispute resolution services.  One of the judges charges an hourly rate of $600, while the other charges an hourly rate of $470.

(Richter Certif. at 2-3.)[8]  Defendants submitted the costs for

three potential arbitrators, including (1) a retired judge who

charges a retainer of $2,000 from each party and thereafter a

rate of $500 per hour;[9] (2) a Pennsylvania attorney who charges

$2,400 per day for hearings, travel expenses, and $400 per hour

for study time; and (3) an employment dispute arbitrator that

charges a per diem rate of $1,750.  (Rattay Certif. at 5-6.)

Based on this information, the parties do not appear to

dispute that $500 per hour is a reasonable rate for an

arbitrator, and that a hearing on the matter could last two

weeks.  (See Pl. Br. at 9; Def. Br. at 28.)  Plaintiffs, however,

contend that the cost will be greater than $40,000 for the

hearing, and could potentially reach $100,000, after the

following costs are included: (1) meeting with the parties and

scheduling discovery; (2) considering and resolving discovery

disputes; (3) pre-hearing motions; (4) pre-hearing preparation;

---

[8]    Plaintiffs have also submitted the costs of three private
arbitration companies, none of which are the company identified
in the arbitration agreement: (1) National Arbitration Forum –
with at least $300,000 in dispute, the initial fee would be
$2,000 per party plus additional "administrative fees" to be paid
at a later time; (2) JAMS – each party is charged up to $1,200
for the first three days, followed by a percentage of the
professionals' fees for each additional day; and (3) Institute
for Conflict Prevention and Resolution – $3,000 per party.
(Richter Certif. at 4-5.)

[9]    Plaintiffs' attorney contends he attended a private
mediation before this judge, and the cost was $8,550 for a half-
day mediation session.  (Richter Certif. at 3.)

(5) reviewing post-hearing submissions; and (6) drafting the written award.  (Pl. Br. at 9.)   Plaintiffs, moreover, argue the "arbitration clause is not designed to encourage expeditious, informal, and cost-effective resolution to disputes," but that "it is designed to serve as a financial gun to Mr. Shapiro's head, with Defendant's [sic] proverbial finger on the trigger should Mr. Shapiro dare to challenge their actions."  (Id. at 20.)   They assert, given Baker's "multi-billion dollar resources it is not unrealistic to estimate Mr. Shapiro's exposure in the multiple hundreds of thousands of dollars."  (Id. at 19.)

After examining in depth plaintiffs' financial status and the costs of arbitration, the Court concludes that the arbitration agreement is not substantively unconscionable because the arbitration will not be so prohibitively expensive to plaintiffs that they cannot take advantage of the contractually agreed upon arbitral forum.  Plaintiffs appear to have sufficient resources to pay their share of the costs and, although the costs may be significant and unpleasant, plaintiffs should not be undermined or deterred from bringing the suit.[10]

_____

[10]   Plaintiffs stress the high cost of supporting a family, the struggle to save for their young daughters' college educations, and their fiscal prudence, as well as the tumultuous economy, in making their unconscionability argument.  (See Shapiro Certif.; Pl. Br. at 11-12.)  While the Court does not discount these considerations, such factors do not change the contractual agreement into which Shapiro willingly entered.

Plaintiffs' statutory rights, moreover, will not be impeded by requiring the parties to submit to the agreed upon arbitration.  Plaintiffs will have full recourse to pursue all of their claims against Baker.  There are no limitations on plaintiffs' statutory, contractual, or common law rights, claims plaintiffs may assert, or the damages plaintiffs may recover.[11] The arbitration provision, negotiated by sophisticated business people who are parties to this litigation and their attorneys, does not unreasonably favor the defendants; all of the arbitration provision terms apply equally to both parties.  The provision does not affect any party's right to obtain a fair arbitration decision, nor does it give any party an unfair right of appeal.  See Fleck v. J.A. Moore & Sons, No. 98-69, 1999 WL 1847435, at *3 (Del. Ct. Com. Pl. Jan. 29, 1999).  The cost-shifting provision regarding attorney's fees and costs, moreover, may work to the benefit of either party, as it neutrally entitles

---

[11]    The APA arbitration provision specifically provides "the arbitrator shall be expressly empowered to determine and award any and all types of Losses."  (Rattay Certif., Ex. B at 15.)

the "prevailing party" to attorney's fees if the party prevails on all material respects.[12]

The Court, furthermore, finds that the arbitration provision is not procedurally unconscionable.  To make this declaration, the Court would have to find that a party had superior bargaining power and used that power to take unfair advantage of another. See Alexander, 341 F.3d at 265.  Shapiro, however, had ample opportunity to read the contracts and bring any disputed provisions to the attention of defendants.  There was no absence of meaningful choice here, and plaintiffs do not contend Shapiro was under any compulsion to sign the agreements.  See Gay, 511 F.3d at 392.  Shapiro could have rejected the contracts if any term contained therein was objectionable.  Instead, Shapiro signed the APA and Employment Agreement, and commenced employment for Baker.  See Fleck, 1999 WL 1847435, at *2.  The Court further emphasizes that Shapiro, the prior owner of LSF, is a sophisticated businessperson with relevant experience and

_____

[12]    The Court notes that although the final impact of the APA arbitration provision remains speculative until the objecting party has actually lost and been directed by the arbitrator to pay, this is a distinction without a material difference.  See Parilla, 368 F.3d at 284; cf. Goodman v. ESPE Am., No. 00-862, 2001 WL 64749, at *4 (E.D. Pa. Jan. 19, 2001) ("While the potential of having to pay costs and attorney's fees if unsuccessful may deter some plaintiffs from bringing marginal cases, it is far less a deterrence than ordinary fee-splitting arrangements or the large initial deposits involved in other cases.").

familiarity with the ramifications of signing a contract.  <u>Cf.</u>
<u>Alexander</u>, 341 A.3d at 267; <u>Parilla</u>, 368 F.3d at 279.[13]

     Plaintiffs further contend that New Jersey cases "evidence
judicial abhorrence for fee and cost shifting provisions against
litigants seeking to protect statutorily granted rights," and
such provisions are "therefore, by definition, not accepted
'business-practices-in-the-community,' and are so one-sided as to
be inherently unconscionable."  (Pl. Br. at 23.)   Although New
Jersey law is not the governing law in this case, the Court would
likely reach the same result even if it was applying such law.
While New Jersey law and policy may disfavor the shifting of
attorney's fees and costs, "it is well settled that courts will
enforce contractual fee shifting provisions."  <u>King v. GNC</u>
<u>Franchising</u>, No. 04-5125, 2007 U.S. Dist. LEXIS 37547, at *10
(D.N.J. May 23, 2007); <u>see also</u> <u>N. Bergen Rex Transp. v. Trailer</u>
<u>Leasing Co.</u>, 730 A.2d 843, 848 (N.J. 1999); <u>Cmty. Realty Mgmt. v.</u>

---

[13]   The Court does not find persuasive plaintiffs' contentions
that "'take it or leave it' type of unequal bargaining power the
courts routinely find unconscionable" is evidenced by the fact
that "the changes which [Shapiro] sought to incorporate into the
revised portion of the [APA] arbitration provision were rejected
by Defendants."  (Pl. Br. at 20-21.)   Shapiro was represented by
an attorney, and was able to negotiate other aspects of the sale.
There is no evidence that this sale would not have taken place if
Shapiro refused the arbitration agreement.
     Moreover, the Court does not agree with plaintiffs' argument
that the scope of the arbitration provision is unconscionably
vague under the standards endorsed by the New Jersey courts.
(<u>Id.</u> at 25-28.)   The arbitration provision does not infringe on
plaintiffs' statutory rights, and, as discussed <u>infra</u>, it is
sufficiently broad to encompass plaintiffs' claims.  (<u>See</u> <u>infra</u>
sec. IV.)

<u>Harris</u>, 714 A.2d 282, 293 (N.J. 1998); <u>cf. Delta Funding Corp. v.</u>
<u>Harris</u>, 912 A.2d 104, 112-14 (N.J. 2006) (mandating that an
arbitration clause may not limit the statutory rights available
to the parties).[14]  Because the Court does not discern any
factors that would render the provision at issue unfair or
unconscionable, the Court thus finds that the APA arbitration
provision may be enforced in this case.

**IV.  Plaintiffs' Claims Fall Within the Arbitration Agreement**

The Court must now determine whether plaintiffs' claims,
which arise primarily under the Employment Agreement, are
arbitrable under the APA's arbitration provision.  Plaintiffs
contend that the arbitration agreement is limited to disputes
surrounding the APA and the transfer of ownership of LSF to Baker
and thus does not apply to the claims at issue.  (Pl. Br. at 29-
31.)  Defendants, however, argue that the plain language of the
arbitration provision, as well as the manner in which the
Employment Agreement was entered into, demonstrate the parties

---

[14]    Notably, even if the Court were to apply New Jersey law as
to the issue of unconscionability, the applicable principles
would be the same, as the doctrine of unconscionability in New
Jersey is substantially similar to that of Delaware.  <u>See</u> <u>Sitogum</u>
<u>Holdings v. Ropes</u>, 800 A.2d 915, 921 (N.J. Super. Ct. 2002)
(noting that procedural unconscionability consists of "unfairness
in the formation of the contract" and substantive
unconscionability consists of "excessively disproportionate
terms.").

intended to arbitrate all claims at issue.  (Dkt. entry no. 26, Def. Reply Br. at 10.)

The applicability of the arbitration provision to the Employment Agreement turns on whether the APA and the Employment Agreement should be construed as a single integrated agreement. Battaglia, 233 F.3d at 728; see Detroit Med. Ctr., 269 F.Supp.2d at 493 (considering several factors to determine whether claims were arbitrable under arbitration provision contained in separate but related agreement).  Under Delaware law,

> [o]ther writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and therefore, may properly be considered in the construction of the contract.  Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.

I.U. N. Am. v. A.I.U. Ins. Co., 896 A.2d 880, 886 (Del. Super. Ct. 2006).  A contract can be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention.  Realty Growth Investors v. Council of Unit Owners, 453 A.2d 450, 454 (Del. 1982).  A single provision or paragraph of a contract, moreover, must be read in the context of the remainder of the agreement, not in isolation.  I.U. N. Am., 896 A.2d at 886.

Both the APA and Employment Agreement clearly relate to each other insofar as they are both part of an overall plan set forth in the APA for the sale of LSF to Baker.  The APA is an umbrella

27

agreement that outlines the structure of the entire transaction. Its primary purpose is to govern the transfer of ownership and assets from Shapiro to Baker.  Shapiro's employment at Baker, allotting Shapiro the potential opportunity to earn an additional $300,000 in earn-out payments and an annual salary for a fixed amount of years, was one condition of the sale of LSF.  (See Rattay Certif., Ex. B at 4.)

The APA, containing the arbitration provision, expressly refers to the Employment Agreement at various points, attaches the Employment Agreement as "Exhibit A," and expressly states that the Employment Agreement is "incorporated herein by reference."  (Id. at 4, 10, 11, 24.)  This language, read in context of the remainder of the APA and Employment Agreement, demonstrates the unequivocal intent of the parties to bind Shapiro's employment related disputes to arbitration.[15]

In addition to the express contractual language, an intention to incorporate the Employment Agreement into the APA is

---

[15]    Plaintiffs argue that because some of the other transaction documents were referred to in the APA as "schedules," rather than "exhibits," the parties did not intend to incorporate the Employment Agreement into the APA.  (Pl. Br. at 29-31.) Plaintiffs, however, ignore the plain language of the agreement, incorporating the Employment Agreement by reference.  Plaintiffs, moreover, offer no authority to support its position that the Employment Agreement should not be considered one of the "other Transaction Documents" referenced in the arbitration provision. See Sharon Steel Corp. v. Jewell Coal & Coke Co., 735 F.2d 775, 778 (3d Cir. 1984) ("So long as the . . . claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator.").

also shown by the contracts' execution by the same contracting parties, sophisticated business people and entities represented by counsel, at the same time, in the course of the same transaction.  See, e.g., Harmonic Inv. Mgmt. v. Casals, No. 06-2825, 2006 WL 3341202, at *3 (N.D. Ill. Nov. 17, 2006); see also Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 448 (3d Cir. 2003) (enforcing arbitration provision incorporated into contract by reference); cf. Rosen v. Mega Bloks, No. 06-3474, 2007 WL 1958968, at *5 (S.D.N.Y. July 6, 2007) (finding certain facts – that the "document [was] an 'integral part' of a larger transaction" and that separate agreements were executed simultaneously – not to be dispositive).

Plaintiffs' claims, furthermore, fall under the scope of the APA arbitration provision, "not simply because the two contracts were to be part of a single transaction or had been executed at the same time," but based upon the breadth of the provision. Rosen, 2007 WL 1958968, at *5; S.A. Mineracao da Trindade-Samitri v. Utah Int'l, 745 F.2d 190, 195-96 (2d Cir. 1984) (finding agreements containing arbitration provision were "an umbrella" for later agreements, and disputes arising under the later agreements were arbitrable); Detroit Med. Ctr., 269 F.Supp.2d at 493 (finding broad arbitration provision indicated intent for the provision to reach "the aspects of the transaction governed by contemporaneously executed documents").  The APA's arbitration

provision is broad in scope, sweeping into its reach "[a]ny controversy, dispute or claim for money damages arising out of or relating in any to [the APA] or the other Transaction Documents to which the Parties are a party."  (Rattay Certif., Ex. B at 15.)  See Medtronic Ave v. Cordis Corp., 100 Fed.Appx. 865, 868 (3d Cir. 2004) (finding that "arising out of" should be given broad construction); Detroit Med. Ctr., 269 F.Supp.2d at 492 (finding "arising out of or relating to" language to be indicative of a broad arbitration provision); Karish v. SI Int'l, No. 19051, 2002 WL 1402303, at *4 (Del. Ch. June 24, 2002) (same); Bayless v. Davox Corp., No. 17560, 2000 WL 268310, at *5 (Del. Ch. Mar. 1, 2000) (same).

The plain language of the arbitration provision - stating "this Agreement or the other Transaction Documents" – supports a finding that the Court not confine its reading of the provision solely to the APA.  In light of the federal policy mandating that we interpret contractual language in favor of arbitration, the Court reads the language "or the other Transaction Documents" to refer to the sufficiently related Employment Agreement.  See Brayman Constr. Corp., 319 F.3d at 625 (interpreting "any transaction involved" to pertain to any business dealing relating in whole or in part to a present dispute under agreement containing arbitration provision); cf. Goodrich Cargo Sys. v. Aero Union Corp., No. 06-6226, 2006 WL 3708065, at *3 (N.D. Cal.

30

Dec. 14, 2006) (finding provision stating "this Agreement," and
failing to refer to any other agreement, pertained only to the
mentioned agreement, rather than the larger business
transaction).[16]  The Court thus finds that the arbitration
provision contained in the APA is sufficiently broad to cover
disputes related to the Employment Agreement.  See Detroit Med.
Ctr., 269 F.Supp.2d at 493 (finding that "based on the broad
arbitration provision in the Services Agreement and the fact that
the agreements were executed contemporaneously as part of the
same transaction, the . . . Services Agreement arbitration
provision applies to claims arising under the Asset Agreement
because such claims clearly 'relate to' the Services Agreement");
Steele v. Control Fluidics, No. 84-3814, 1985 WL 4299, at *3-*5
(E.D. Pa. Dec. 9, 1985) (finding employment contract arose under
or related to an asset purchase agreement and related claims
should be arbitrated); see also Collins & Aikman Prods. Co. v.
Bldg. Sys., 58 F.3d 16, 23 (2d Cir. 1995) (finding that where
there is a broad arbitration provision, even a collateral matter
may be arbitrated if the claim alleged "implicates issues of

---

[16]    The APA, moreover, specifies that "Transaction Documents"
refers to "this Agreement and the other agreements, documents and
instruments contemplated hereby."  (Rattay Certif., Ex. B at 6.)

contract construction or the parties' rights and obligations under it").[17]

In sum, all of the claims raised by plaintiffs appear to relate closely to the Employment Agreement and the APA, and should be subjected to arbitration.

## V.   Mrs. Shapiro's Loss of Consortium Claim May Be Arbitrated

Plaintiffs contend that Mrs. Shapiro's claim for loss of consortium should not be sent to arbitration because Mrs. Shapiro was not a party to the APA, was not employed by Baker, and did not sign an agreement with Baker.  (Pl. Br. at 35-37.)

The loss of consortium claim, however, is directly related to, factually intertwined with, and derivative of the other claims asserted by plaintiffs.  The derivative nature of this claim brings it within the arbitration provision's scope.  See Troshak v. Terminix Int'l Co., No. 98-1727, 1998 U.S. Dist. LEXIS 9890, at *19 (E.D. Pa. July 2, 1998); see also Murray v.

----

[17]   The remedies provision in the Employment Agreement, noting that each party is "entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor" and "any party may in its sole discretion apply to any court of law or equity of competent jurisdiction . . . for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement," is not inconsistent with the arbitration provision.  The parties remain free to pursue claims for money damages through arbitration, and to appeal to the courts for equitable relief. The arbitration provision does not preclude plaintiffs from having full recourse to assert their claims against Baker.  (See supra sec. III.)

Commercial Union Ins. Co., 782 F.2d 432, 438 (3d Cir. 1986)
(holding, in a breach of employment contract context, that
plaintiff's wife's right to recover for loss of consortium was
derivative to that of her husband); Weir v. Mkt. Transition
Facility of N.J., 723 A.2d 1231, 1236 (N.J. App. Div. 1999)
(stating a per quod claim is a derivative claim, not a separate
cause of action, and "must be joined with the primary claim in a
single action") (internal quotations and citations omitted).
This claim should proceed to arbitration with the rest of the
claims.

## VI. Dismissal Without Prejudice

Because the Court finds all of the claims are arbitrable,
the Court will dismiss the Complaint without prejudice rather
than stay the Complaint.  See Blair, 283 F.3d at 600-02; Seus v.
Nuveen & Co., 146 F.3d 175, 179 (3d. Cir. 1998).

### CONCLUSION

There is a valid and enforceable arbitration agreement here.
The dispute between the parties falls within the language of the
arbitration agreement.  For the reasons discussed supra, the
Court will dismiss the Complaint without prejudice.  The Court
will issue an appropriate order and judgment.


                              s/ Mary L. Cooper
                         **MARY L. COOPER**
                         United States District Judge

Dated:    June 9, 2009

33